## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **PUERTO RICO HORSE OWNERS ASSOCIATION (PRHOA),** On behalf of its members<br><br>Plaintiff,<br><br>v.<br><br>**CAMARERO RACE TRACK CORPORATION; ERVIN RODRÍGUEZ,** its President; **CONFEDERACIÓN HÍPICA DE PUERTO RICO; RAFAEL MATOS,** its President, **NILDA FUENTES, ESQ.**, and the Conjugal Partnership between them; **FERNANDO BONNET**, its Agent; and **JOHN DOES 1–10,**<br><br>Defendants. | **CIVIL ACTION NO.**<br><br>PROCEDURAL DUE PROCESS (42 U.S.C. §1983); EQUAL PROTECTION (42 U.S.C. §1983); TAKING WITHOUT JUST COMPENSATION (FIFTH & FOURTEENTH AMENDMENTS); FREEDOM OF SPEECH AND ASSOCIATION (FIRST AMENDMENT); SHERMAN ACT (15 U.S.C. §1, ET SEQ.); INTERSTATE HORSERACING ACT (15 U.S.C. §3001–3007); DECLARATORY AND INJUNCTIVE RELIEF (28 U.S.C. §§2201–2202); TRIAL BY JURY DEMANDED |

## COMPLAINT

### I.    NATURE OF THE ACTION

1.    This is a civil rights, constitutional, and antitrust action brought under 42 U.S.C. §1983, the First, Fifth, and Fourteenth Amendments, the Sherman Antitrust Act of 1890, 15 U.S.C. § 1, et seq. (the "Sherman Act"), the Interstate Horseracing Act of 1978 (15 U.S.C. §§3001–3007) (the "IHA"), and related federal laws.

2.    Plaintiff Puerto Rico Horse Owners Association ("PRHOA"), on behalf of its members, seeks declaratory, injunctive, and monetary relief arising from defendants' concerted scheme to exclude PRHOA and its members from participating in simulcast-in wagering revenues to which they are legally entitled under Puerto Rico law, and to coerce them to join Confederación Hípica de Puerto Rico ("CHPR"), the other competing association of licensed horse owners by the Puerto Rico Racing Commission (the "Commission").

3.      Camarero Race Track Corporation ("Camarero") operates under an exclusive franchise granted by the Commission an instrumentality of the Government of Puerto Rico and acts as a state actor when managing and distributing state-regulated racing revenues. Acting in concert with CHPR, Camarero is depriving the members of PRHOA of property rights, violating their due process and equal protection rights, and is engaging in anticompetitive and monopolistic conduct in violation of federal law.

## II.      JURISDICTION AND VENUE

4.      This Court has jurisdiction under 28 U.S.C. §1331, 28 U.S.C. §1343(a)(3)-(4), and 28 U.S.C. §1337. PRHOA also invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367 to hear the Commonwealth of Puerto Rico's law claims because they arise from the same nucleus of operative facts as the federal claims stated herein.

5.      Venue lies in this district under 28 U.S.C. §1391(b), as all defendants reside and conduct business in Puerto Rico and the events giving rise to the claims occurred therein.

## III.    PARTIES

6.      Plaintiff **PRHOA** is a duly registered non-profit association, organized under the laws of the Commonwealth of Puerto Rico, corporate registry number 321385, that represents its members consisting of licensed racehorse owners whose thoroughbred horses participate in official races at *Hipódromo Camarero* racetrack (the "Camarero Racetrack"), Canóvanas, Puerto Rico, the only licensed racetrack by the Commission existing in Puerto Rico. PRHOA's postal address is P.O. Box 192239, San Juan, PR. 00919-2239, and its physical address is Hipódromo Camarero (Barn Area), Canóvanas, PR 00729.

7.      Defendant **Camarero** is a duly registered corporation, organized under the laws of the Commonwealth of Puerto Rico, corporate registry number 147761, which holds the exclusive

license to conduct horse racing the Camarero Racetrack and pari-mutuel wagering in Puerto Rico. Camarero's, with physical address at Canóvanas, Puerto Rico and postal address of P.O. Box 1643, Canóvanas, PR 00729. Its resident agent is Alberto C. Rodríguez Law Offices, P.S.C., with postal and physical address at 33 Resolution Street, Suite 805, San Juan, PR. 00920-2707.

8.      Defendant **Ervin Rodríguez** ("Mr. Rodríguez") is Camarero's President directing directed the exclusionary conduct alleged in this Complaint. He is married but the name of his spouse is currently unknown, therefore, Jane Doe I is added as a defendant, as well as the conjugal partnership composed by Mr. Rodríguez and Jane Doe I. Mr. Rodríguez' residential and postal address are unknown, so the physical and postal address of Camarero are being used. Mr. Rodríguez is liable in his individual and personal capacity for participating in illegal acts described in this Complaint.

9.      Defendant **CHPR** is a duly registered non-profit association of horse owners, organized under the laws of the Commonwealth of Puerto Rico, corporate registry number 16094, recognized by Camarero as the exclusive representative of its members for simulcast purposes, to the exclusion of PRHOA's members from participating in the wagering arising from simulcast in. CHPR's physical address is Hipódromo Camarero (Barn Area), Canóvanas, PR. 00729, and its postal address is P.O. Box 4460, Carolina, PR 00984-4460. CHPR's resident agent is Edwins Montaño, with the same physical and postal addresses as CHPR.

10.     Defendant **Rafael Matos** ("Mr. Matos") is the President of CHPR and has participated in the conspiracy to exclude the members of PRHOA from participating in their constitutionally protected property. He is married to Nilda Fuentes, Esq. Their residential and postal address are unknown at present, therefore the physical and postal address of CHPR,

Hipódromo Camarero (Barn Area), and is liable in his individual and personal capacity for participating in the illegal acts described in this Complaint.

11.    Defendant **Fernando Bonnet** ("Mr. Bonnet") is PRHOA's former executive and CHPR current employee and agent, who has participated in the conspiracy to exclude PRHOA from the participation of constitutionally protected property. He is single, his physical and postal address is Urb. Villa Lissette, Benítez street B15, Guaynabo, PR 00969, and his email is fernandobonnet13@gmail.com. Mr. Bonnet is liable in his individual and personal capacity for participating in and promoting the illegal acts described in this Complaint.

12.    **John Does 1–10** are unknown persons or entities who have participated in the wrongful acts set forth in this Complaint and will be identified through discovery.

13.    Camarero, Mr. Rodríguez, CHPR, Mr. Matos, Mr. Bonnet and John Does 1-10, collectively are referred to herein as the "Defendants".

## IV.    FACTUAL BACKGROUND COMMON TO ALL CAUSES OF ACTION

### A.    In General

14.    The horse racing industry and sport in Puerto Rico is highly regulated by the Commonwealth of Puerto Rico. Under the "Government of Puerto Rico Gaming Commission Act," 15 L.P.R.A. § 981 *et seq*. (the "Gaming Commission Act"), horse racing activities are regulated by the Commission,  a governmental agency vested with statutory authority to oversee the racing industry and sport, and enforce compliance with the "Puerto Rico Horse Racing Industry and Sport Act" (the "Horse Racing Act") and applicable regulations.

15.    The Commission has ample powers to regulate horse racing activities in Puerto Rico. Section 4 of the Horse Racing Act, 15 L.P.R.A. § 198e, titled "Powers of the Government of Puerto Rico Gaming Commission", which states:

(a) The Commission is hereby empowered to regulate all matters concerning the Horse Racing Industry and Sport. The Commission, after holding a public hearing, shall adopt such Horse Racing Sport regulations it deems necessary, which, once approved by the Commission and filed with the Department of State pursuant to the provisions of Act No. 38-2017, the 'Government of Puerto Rico Uniform Administrative Procedure Act,' shall have force of law and the violation thereof shall constitute an offenseas provided in this Act.

(b) Among other things, the Commission shall have the authority to:

    1. **Establish by regulations the necessary and essential requirements which, in its judgment, every racetrack should meet to operate as such; establish the terms and conditions to meet said requirements; issue temporary licenses for the period granted to racetrack owners to meet the Board's requirements; cancel any licenses issued temporarily to their holders or their representatives if they fail to comply with the terms thereof; ensure public safety as well as the reliability, honesty, and integrity of the horse racing sport**. Provided, that when financial information is required to grant permits or licenses to operate a racetrack, the financial information received by the Board shall be deemed to be confidential and may not be disclosed, except as provided by the Board and the applicable laws.

      a. When considering an application for operating a new racetrack, the Board shall require the applicant to demonstrate that the approval of the racetrack operations application shall be in the best interest and benefit of the horse racing industry, that it shall not affect the stability thereof, and that there shall be sufficient inventory of racehorses to sustain the independent operation of said racetrack.(Emphasis added).

16.    "Operator", as defined in the Horse Racing Act, "[m]eans a natural or juridical person authorized by means of a license to operate a racetrack in Puerto Rico" (15 L.P.R.A. § 198b (27)).

17.    "Racetrack", as defined in the Horse Racing Act, "[m]eans the place authorized through a license issued by the Government of Puerto Rico Gaming Commission for holding horse races in the jurisdiction of Puerto Rico and placing bets".

18.    Camarero is the only operator of the only licensed racetrack in Puerto Rico, with a racetrack license issued by the Commission, a government agency of the Commonwealth of Puerto

Rico. According to Section 12 of the Horse Racing Act, Camarero pays annual fees, which are collected by the Executive Director of the Commission (see, 15 L.P.R.A. § 198r).

19.    Camarero, as the operator of Camarero Racetrack, has its own on-track betting tellers and designates off-track betting tellers and off-track betting locations (see, 15 L.P.R.A. § 198b (1) and (2)); is the owner of the "barns, stalls, or boxes" the Racetrack, also known as the "stables" (see, 15 L.P.R.A. § 198b (15)); and collects and distributes the wagering proceeds according to the Horse Racing Act, in particularly as established in its Section 13 and Section 29 (for electronic video games system) (see, 15 L.P.R.A. § 198s and y).

20.    The Horse Racing Act allows for simulcasting in Puerto Rico, defined as the "[s]imultaneous live and direct broadcasting of racing events held in foreign racetracks for taking bets on these. This term also refers to racing events held in Puerto Rico to be broadcast overseas for taking bets in another country on those races held in Puerto Rico" (15 L.P.R.A. § 198s).

21.    Pursuant to Section 9 (d) of the Horse Racing Act, the process of authorizing simulcasting is the following:

> The racetrack or racetracks may request the Commission's authorization for simulcasting and/or electronically reproducing in Puerto Rico races held in other racetracks in order to broaden their local race program, accept wagers on, and obtain receipts from imported races. **The deductions provided in Section 20 of this Act shall apply to wagers placed in Puerto Rico on simulcast and/or otherwise electronically reproduced races**. Likewise, racetracks may request the Commission's authorization to simulcast and/or electronically reproduce live races held therein in order to allow other racetracks or authorized interstate offtrack betting locations to place wagers on such races. Racetrack operators are hereby authorized to enter into agreements with other racetracks and/or authorized interstate or international off-track betting locations, and to enter into agreements for simulcasting and/or electronically reproducing races. Any request for exporting the signal of live races held for placing interstate or international wagers shall be submitted to, and approved by the Commission and have the consent of the group representing a majority of horse owners participating in the applicant racetrack or the direct consent of the owners absent an owners' association representing a majority of owners. The Commission shall prescribe by regulations reasonable

requirements for approving the simulcasting on a case by case basis, which shall operate independently from the local races.

(Emphasis added).

22.    Section 13 of the Horse Racing Act,[1] 15 L.P.R.A. § 198s, specifically states the

deductions that can be made by Camarero as the operator of the Camarero Racetrack, stating:

> Natural or juridical persons **operating racetracks** or firms authorized to calculate official payoffs, **shall only make the following deductions on the bets placed in their racetracks and in offtrack betting locations**. If there is a conflict with any law in effect, said law shall be rendered ineffective, and the deductions provided herein shall apply. If the gross amount wagered in any fiscal year does not exceed $165,000,000, the following deductions shall apply:
>
> […]
>
> (4) Other authorized bets on the total gross amounts wagered:
>
> (a) Eleven percent (11%) for off-track betting tellers' commissions.
>
> (b) **32.30% to be divided according to the agreement between the racetrack operator and the horse owners**.
>
> (c) **4.40% for the State Treasury's General Fund**.
>
> (d) 1% for the Breeders' Fund.

(Emphasis added).

23.    Bets placed under the simulcasting system are other authorized bets on the total

gross amounts wagered, regulated by Section 13(4) of the Horse Racing Act.

24.    Therefore, Camarero, operating under an exclusive license or franchise from the

Commonwealth, administers all wagering proceeds under governmental regulation, including

simulcasting, making it an instrumentality of the state.

---

[1] When the Commission Act became effective on July 29, 2019, several articles of the Horse Racing Act were amended or renumbered. To that effect, Article 6.13 of the Gaming Commission Act amended and renumbered Article 20 of the Horse Racing Act, which thereby became Article 13 of the Horse Racing Act, 15 L.P.R.A. §198s (see also the full title of the Gaming Commission Act).

25.     Horse owners under the Horse Racing Act need to have a valid license issued by the Commission (15 L.P.R.A. § 198b (24)). As discussed below, all licensed thoroughbred horse owners are legally entitled to share in the proceeds from simulcast-in wagering (see 15 L.P.R.A. § 198s).

26.     For many years, prior to PRHOA's creation, CHPR was the only association of horse owners operating at the Camarero Racetrack consisting of the majority of the horse owners in Puerto Rico.

27.     On January 23, 2007, Camarero and CHPR entered into a written agreement (the "Contract"), with an expiration date of December 31, 2010 (**Exhibit A**), since then Purposedly renewed on a month-to-month basis by Camarero and CHPR excluding PRHOA as part thereof in clear violation of federal and state laws.

28.     On January 29, 2013, several licensed horse owners decided to form PRHOA, a lawful association whose founding and continuing purpose is to protect and promote the interests of its members and all participating racehorse owners in Puerto Rico, as well as the welfare of the horses racing at the Camarero Racetrack. PRHOA is composed of a substantial number of licensed thoroughbred horses, many of whom own a significant number of thoroughbreds participating at the Camarero Racetrack. As mandated by state law, since PRHOA's creation, Camarero has uninterruptedly distributed simulcast in proceeds to PRHOA's members and nonaffiliated horse owners to either PRHOA or CHPR.

29.     When comparing the percentage of total purse earnings generated by PRHOA members with that of all licensed horse owners in Puerto Rico, PRHOA's members collectively account for no less than twenty-three percent (23%) of the total purses distributed annually from the official races held at Camarero Racetrack.

30.    PRHOA is not a contracting party to the Contract, and the Supreme Court of Puerto Rico expressly so held in *Puerto Rico Horse Owners Association v. Confederación Hípica de Puerto Rico*, 202 D.P.R. 509 (2019) ("*PRHOA v. CHPR*"), a final and unappealable decision. PRHOA respectfully requests that this Honorable Court take judicial notice of that judgment.

31.    However, since PRHOA's organization, Camarero and CHPR unlawfully applied the Contract to PRHOA and its members, deducting sums from the purse earnings of their horses not authorized by the Horse Racing Act, but stemming from the Contract to which PRHOA has never been a party.

32.    The Contract violates the Horse Racing Act, the IHA and it is unconstitutional since it requires racehorse owners to be affiliated to the CHPR to receive simulcast-in proceeds.

33.    On November 26, 2021, PRHOA filed a suit against Camarero and CHPR in the Puerto Rico Court of First Instance (Case No. CN2021CV00388) (the "State Case"), seeking the return of the illegally deducted funds and an injunction to permanently halt the unlawful practice.

34.    The State Case remains pending and unresolved as of this filing.

35.    In the meantime, Camarero and CHPR, through their respective presidents and other agents, including  Mr. Bonnet, have been for some time  conspiring to harm PRHOA and its members by means of in-person meetings, email correspondence, and other interstate electronic communications to deprive PRHOA and its members of their legal right to receive their share of the wagering on simulcast in races arising from sources outside of Puerto Rico. This concerted conduct constitutes a clear violation of the United States Constitution and applicable federal and Commonwealth law.

36.    Via a letter sent on October 17, 2025, following private meetings between Camarero and CHPR, PRHOA received notice that beginning on **November 1, 2025**, Camarero would cease distributing proceeds from simulcast in wagering to PRHOA and its members.

37.    PRHOA has made multiple efforts to persuade Camarero not to do so, but all such efforts have failed. As a result, PRHOA and its members now face imminent and irreparable harm.

38.    PRHOA's members hold a property right in the simulcast in revenues allocated to all licensed racehorse owners participating at the Camarero Racetrack. This right is established by Puerto Rico statutory law and protected by the Constitution of the United States and applicable federal law.

39.    In *PRHOA v. CHPR*, supra, the Puerto Rico Supreme Court further recognized that horse owners have a constitutional right to affiliate—or to decline to affiliate—with any association of their choosing, rights grounded in the freedom of expression and association guaranteed by the Constitutions of Puerto Rico and the United States.

40.    Currently, Camarero and CHPR are conditioning the payment of monies—belonging by law to all licensed racehorse owners—on those their mandatory membership in CHPR, in direct violation of constitutional protections.

41.    The Defendants are jointly engaged in a pattern, scheme, and agreement, as well as acts and omissions, that violate the United States Constitution and other applicable federal statutes, designed to deprive PRHOA and its members of their rights, benefits, and lawful participation in the horse racing industry.

42.    Camarero's decision to halt payments of proceeds from simulcast into PRHOA's members is arbitrary, lacks any statutory or regulatory basis, was made without notice or hearing, and directly violates Puerto Rico law.

43.     The exclusion seeks to coerce PRHOA's members into joining CHPR, thereby consolidating political and financial control over the racing industry. If this were to happen, only one racehorse owners' association would forcibly exist.

44.     The Commonwealth receives a percentage of all wagers at the Racetrack, confirming the symbiotic relationship between Camarero and the state, not only resulting from the exclusive license granted by the state to Camarero to operate the Racetrack but in the monetary participation of the state in Camarero's operation of the Racetrack.

45.     Defendants' conduct will deprive PRHOA and its members of their property rights without due process, the equal protection of the Racing Act, and will restrain trade in violation of federal law.

B.     Camarero Acting under Color of State Law

46.     Camarero operates under an exclusive franchise and license granted by the Government of Puerto Rico pursuant to the Horse Racing Act and related regulations. Through this statutory framework, the Commonwealth has delegated to Camarero the authority to organize, manage, and regulate certain areas of the horse racing industry, including the operation of the Racetrack and related activities, as well as the collection and distribution of pari-mutuel wagering, and simulcast activities on the island, with the corresponding deductions. No other private entity is permitted to perform these functions.

47.     As a result, Camarero's actions are "fairly attributable to the state" and constitute state action for purposes of the Fourteenth Amendment and 42 U.S.C. §1983. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). When a private entity exercises powers that are traditionally the exclusive prerogative of the state, it is bound by constitutional limitations. See *West v. Atkins*, 487 U.S. 42, 49–50 (1988); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974).

48.     Specifically, Camarero qualifies as a state actor under multiple recognized legal doctrines:

a.  *Public Function Doctrine* – The management of the Camarero Racetrack and its grounds; the receipt and allocation of purse proceeds; the designation of off-track betting parlors and locations; and the enforcement of racing rules are traditionally governmental functions. By statute, Camarero performs these duties on behalf of the Commonwealth and under the direct supervision of the Commission. This agency oversees Camarero's compliance with the Racing Act and approves operational rules, while the Government of Puerto Rico receives a percentage of all wagers as public revenue. See *Evans v. Newton*, 382 U.S. 296 (1966) (private entity performing public function deemed state actor).

b.  *Close Nexus / Joint Action Doctrine* – There exists a symbiotic and interdependent relationship between Camarero and the Government of Puerto Rico. The Commonwealth shares Camarero's revenues through mandatory distributions of wagering proceeds and directly benefits from its operations. The State, in turn, has granted Camarero monopoly control, supervises its activities, and enforces its decisions as part of the official regulatory structure. This entanglement renders Camarero's actions "jointly engaged" with the state. See *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961).

c.  *State Compulsion Doctrine* – Puerto Rico law requires Camarero to act pursuant to state law and regulations, and its decisions on purse distributions and simulcast proceeds are governed by the statutory framework. The Commonwealth compels and enforces these actions through its licensing authority and coercive power. When

a private entity's conduct is compelled or significantly encouraged by the state, it constitutes state action. See *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

d. *Delegation of Sovereign Power* – Camarero's authority to distribute simulcast proceeds, designate off-track betting parlors and locations, and impose or withhold payments is an exercise of delegated sovereign power. The Commonwealth has entrusted Camarero with quasi-public duties that directly affect property rights and the livelihood of licensed horse owners, and thoroughbred horses breeders. When the state delegates such authority, constitutional accountability follows. See *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).

49.     Moreover, Camarero's revenues and operational decisions are statutorily intertwined with the Commonwealth's public funds and regulatory oversight. The Government of Puerto Rico collects a statutory share of wagering proceeds and maintains supervisory jurisdiction over all racing and betting operations, confirming that Camarero functions as an instrumentality of the state and not as a purely private enterprise.

50.     Accordingly, **Camarero's conduct in suspending the simulcast-in proceeds to PHROA and its members constitutes state action taken under color of law**, directly subject to the restrictions of the **First, Fifth, and Fourteenth Amendments** and actionable under **42 U.S.C. §1983**. Camarero's decision to favor one association of horse owners (CHPR) over another (PRHOA), and preclude PRHOA's exercise of constitutional rights, and deprive its members of protected property interests, therefore, amounts to **unconstitutional government conduct**, even if implemented through a nominally private entity.

C.    CHPR's Role and Liability for Constitutional and Statutory Violations

51.     CHPR is a private association of horse owners that has maintained a privileged and exclusive relationship with Camarero. Although CHPR is not a public entity, its conduct and participation in the actions challenged herein render it jointly liable for constitutional and statutory violations under 42 U.S.C. §§1983 and 1985(3) and applicable Puerto Rico law.

52.     Specifically, CHPR's liability arises from the following facts and principles:

a.  *Joint Participation and Conspiracy with State Actor*- CHPR acted in concert and coordination with Camarero, an entity operating under color of state law, to deprive PRHOA and its members of their rights to property, due process, and freedom of association. By jointly deciding to suspend simulcast-in distributions to PRHOA's members, CHPR became a willful participant in a joint activity with the state, satisfying the "joint action" requirement for liability under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982). CHPR's leadership, including Mr. Matos and Mr. Bonnet, directly participated in meetings, communications, and planning with Camarero officials, including Mr. Rodríguez, to implement this unlawful decision and enforce it against PRHOA.

b.  *Use of State Authority to Accomplish Private Goals*- CHPR leveraged its longstanding relationship and majority membership of horse owners with Camarero to secure enforcement of its private interests through state action for its benefit and that of its members to the detriment of PRHOA and its members. By influencing Camarero, which exercises delegated governmental authority over purse distributions, CHPR used state power as a tool to suppress PRHOA and coerce PRHOA members to affiliate with CHPR. Courts have consistently held that private

parties who invoke the aid of state officials to achieve unconstitutional ends act under color of law. See *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980).

c.  *Participation in a Civil Rights Conspiracy (§1985(3))*- CHPR knowingly entered into an agreement with Camarero to discriminate against PRHOA members, deprive them of equal protection, and destroy PRHOA as an organization. This conduct constitutes a civil conspiracy to deprive individuals of equal protection under 42 U.S.C. §1985(3). The evidence of concerted meetings, coordinated communications, and explicit statements (such as that "by Christmas PRHOA will disappear") demonstrates the existence of a shared plan and common unlawful objective.

d.  *Economic Coercion and Retaliation*- CHPR used its position and influence to pressure Camarero to condition economic benefits including simulcast-in proceeds and purse distributions, on PRHOA members' affiliation with CHPR. Such conditioning of benefits constitutes compelled association in violation of the First Amendment, as recognized in *Janus v. AFSCME*, 585 U.S. 878 (2018). This conduct also violates Art. II, §§ 6, 7, 8, 19 of Puerto Rico's Constitution protecting association, property, and due process rights.

e.  *Defamation and Reputational Harm as a Means of Suppression*- CHPR and its leadership have engaged in an ongoing campaign to portray PRHOA as illegitimate and unrecognized, to discredit the PRHOA and persuade its members to join CHPR. Such conduct constitutes abuse of rights under Puerto Rico civil law and serves as circumstantial evidence of the conspiratorial objective to eliminate PRHOA as an independent association.

     f.   *Private Actor Liability Under §1983*- While CHPR is nominally private, private parties who are willful participants in joint unconstitutional conduct with state actors are equally liable under §1983. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Lugar*, supra. CHPR's intentional collaboration and conspiration with Camarero by using state-sanctioned authority to deprive PRHOA's members of their rights brings CHPR within the scope of §1983 liability.

D.  <u>Actions Attributed to Mr. Rodríguez</u>

53.    Mr. Rodríguez, as president of Camarero, exercises full managerial control over Camarero's operations, including all decisions concerning the distribution of simulcast proceeds to licensed horse owners. Acting under color of state law, Mr. Rodríguez has used this authority to coordinate and implement the unlawful suspension of payments owed to PRHOA and its members with CHPR, knowing that such action violates Puerto Rico's the Racing Act and applicable regulations, as well as PRHOA's and its members' protected property and associational rights.

54.    Mr. Rodríguez personally directed and approved the issuance of the October 17, 2025, letter notifying PRHOA that Camarero will suspend simulcast-in distributions to PRHOA's members.  This decision was not based on any regulatory order or directive from the Commission, but rather on private discussions and agreements held by CHPR's leadership designed to punish PRHOA for maintaining its independence and pursuing legal action against both entities in the State Case.

55.    Through these coordinated actions, Mr. Rodríguez used Camarero's governmental authority as an instrument of retaliation and coercion, effectively weaponizing its exclusive state license to suppress an association of horse owners that has refused to align itself with CHPR. His conduct thus constitutes state action under 42 U.S.C. §1983, as well as active participation in a

civil conspiracy under 42 U.S.C. §1985(3) to deprive PRHOA and its members of their property and constitutional rights.

56.    Through these acts, Mr. Rodríguez personally directed, facilitated, and ratified conduct that violates the Due Process and Equal Protection Clauses of the U.S. Constitution, the First Amendment's freedom of association rights of PRHOA's members and Puerto Rico's statutory framework governing the fair distribution of wagering proceeds.

E.    Actions Attributed to Mr. Matos

57.    Mr. Matos, as president of CHPR, played a central and deliberate role in orchestrating the conspiracy to marginalize and eliminate PRHOA as a competing association. Mr. Matos has used his position and CHPR's longstanding relationship with Camarero to pressure regulators, negotiate exclusive benefits, and influence operational decisions at Camarero that disadvantage PRHOA and its members.

58.    On information and belief, Mr. Matos personally has devised and implemented a coordinated plan with Camarero to (1) suspend simulcast-in distributions to PRHOA's members; (2) portray PRHOA as illegitimate before state authorities and the public; and (3) coerce PRHOA's members to abandon the association and join CHPR under threat of economic exclusion.

59.    Through his conduct, Mr. Matos knowingly participated in and directed a civil conspiracy in violation of 42 U.S.C. §1985(3) and applicable Puerto Rico law. His actions are not limited to private advocacy but extended to collusive agreements and joint decisions with Camarero that directly resulted in the unlawful deprivation of PRHOA's statutory rights to simulcast-in proceeds.

60.    By exploiting CHPR's influence and its contractual relationship with Camarero, Mr. Matos acted as both architect and beneficiary of the conspiracy, using his position to secure

preferential treatment for CHPR's members while deliberately harming PRHOA's membership, finances, and reputation. His conduct also constitutes abuse of rights under Puerto Rico law, as it was carried out with malice, bad faith, and the specific intent to destroy PRHOA's lawful existence.

F.    Actions Attributed to Mr. Bonnet

61.    Mr. Bonnet served as PRHOA's Executive Director until earlier this year when he was lawfully terminated for cause after engaging in acts in violation of his loyalty and fiduciary duties to PRHOA as a corporate officer. As Executive Director, Mr. Bonnet owed PRHOA and its members the highest duties of good faith, loyalty and confidentiality. However, while still serving in such capacity and thereafter, particularly after having been employed by CHPR immediately after his dismissal by PRHOA he has engaged in conduct designed to destroy PRHOA and benefit CHPR's competing interests.

62.    Following his dismissal, Mr. Bonnet began acting as an agent and collaborator of CHPR, directly coordinating with Camarero's and CHPR's leadership the scheme to deprive PRHOA and its members from receiving their share of simulcast-in wagering. On information and belief, Mr. Bonnet has unlawfully disclosed PRHOA's confidential and proprietary information, including internal strategies, communications, and member data, to assist CHPR and Camarero in their concerted effort to undermine PRHOA's operations, reputation, and ability to lawfully represent horse owners entitled to simulcast-in proceeds.

63.    Mr. Bonnet's conduct represents a clear breach of fiduciary and loyalty duties under Puerto Rico law, and his continued collaboration with CHPR and Camarero constitutes knowing participation in a civil conspiracy to deprive PRHOA and its members of their constitutional and statutory rights, in violation of 42 U.S.C. §1985(3). His actions directly further the scheme to

marginalize PRHOA, suppress its membership, and consolidate control of the industry under CHPR's influence.

64.     Significantly, in conversations with members of the horse racing industry, Mr. Bonnet openly has boasted that "by Christmas, PRHOA will disappear." This statement evidences both his knowledge of and active participation in the conspiracy to dismantle PRHOA and deprive its members of their legal entitlements. Mr. Bonnet's words reveal that Defendants' unlawful plan was deliberate, premeditated, and designed to achieve the total elimination of PRHOA as an independent representative of horse owners in Puerto Rico.

65.     Through these acts, Mr. Bonnet has not only violated his fiduciary obligations to PRHOA but has also joined the ongoing collusive scheme between Camarero, CHPR, and their agents to unlawfully deprive PRHOA and its members of property, due process, and associational rights protected under the First and Fourteenth Amendments, 42 U.S.C. §§1983 and 1985(3), and the Constitution of the Commonwealth of Puerto Rico.

## V.    CAUSES OF ACTION

66.     Defendants at all times relevant to this action were acting under color of state law.

67.     PRHOA re-alleges and incorporates the above paragraphs by reference as if fully set forth herein and in each of the following counts:

### COUNT I – Violation of 42 U.S.C. §1983 (Procedural Due Process)

68.     The Civil Rights Act of 1871 (the "Civil Rights Act") allows for a civil action for deprivation of rights under 42 U.S.C. § 1983, which mandates that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought

against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

69.     The Fourteenth Amendment of the U.S. Constitution, in its relevant part to this matter, states that: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws" (U.S. Const. amend. XIV, § 1).

70.     Defendants, acting under color of state law have deprived PRHOA and its members of a property interest, their statutory right to simulcast proceeds, without notice or opportunity to be heard, in violation of the Fourteenth Amendment of the U.S. Constitution.

### COUNT II – Violation of 42 U.S.C. §1983 (Equal Protection)

71.     Defendants arbitrarily have discriminated against PRHOA and its members by favoring CHPR, a similarly situated association, without any rational basis.

### COUNT III – Violation of 42 U.S.C. §1983 (Freedom of Association)

72.     The First Amendment to the U.S. Constitution asserts that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances" (U.S. Const. amend. I).

73.     By conditioning statutory distributions on forced membership in CHPR, Defendants have violated PRHOA's members' First Amendment rights to freedom of association and speech.

### COUNT IV – Taking Without Just Compensation (Fifth & Fourteenth Amendments)

74.     The Fifth Amendment to the U.S. Constitution states that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation" (U.S. Const. amend. V).

75.     By withholding and redirecting PRHOA members' statutory simulcast-in proceeds, Defendants, acting as state agents, have effected an uncompensated taking of private property without providing just compensation.

### COUNT V – Violation of 42 U.S.C. §1983 (Substantive Due Process)

76.     Defendants' arbitrary, oppressive, and conscience-shocking decision to deprive PRHOA of its statutory rights, motivated by favoritism toward CHPR, another private group, violates the substantive due process protections of the Fourteenth Amendment of the U.S. Constitution.

### COUNT VI – Violation of Sherman Act §1 (15 U.S.C. §1)

77.     Section 1 of the Sherman Act, states that: "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court".

78.     Defendants have conspired to restrain trade through an unlawful group boycott, agreeing to exclude PRHOA and its members from simulcast-in participation.

### COUNT VII – Violation of Sherman Act §2 (15 U.S.C. §2)

79.     Section 2 of the Sherman Act, 15 U.S.C. § 2, asserts that: "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."

80.     Camarero, possessing monopoly power via its exclusive governmental license or franchise, has willfully exercised that power by excluding PRHOA simulcast-in wagering and allowing only CHPR's members to receive the statute-mandated distributions to all horse owners, constituting unlawful monopolization.

### COUNT VIII – Violation of the Interstate Horseracing Act (15 U.S.C. §3001–3007)

81.     The IHA provides that states shall have the primary responsibility to determine what wagering on horse races may lawfully take place within their borders. 15 U.S.C. § 3001(a)(1). Nevertheless, it allows a state to authorize the acceptance of wagers on horse races conducted in another state, provided that such wagering is legal both in the state where the races are held and, in the state, where the bettor is located. The statute expressly stipulates that "no person may accept an interstate off-track wager except in accordance with the provisions of this chapter." 15 U.S.C. § 3003.

82.     The IHA further recognizes that states, including the Commonwealth of Puerto Rico, have the primary responsibility to determine the forms of wagering that may lawfully occur

within their jurisdiction, and that the Federal Government must prevent interference by one state with the wagering policies of another. 15 U.S.C. § 3001(a)(1)–(2).

83.    The conduct of Camarero constitutes a direct violation of the IHA and the Commerce Clause of the United States Constitution. Under the IHA, interstate simulcast wagering may only occur when conducted and distributed in full compliance with applicable state laws. See 15 U.S.C. §§ 3001(a)(1) and 3003.

84.    By unilaterally suspending the payment and distribution of simulcast-in proceeds to PRHOA and its members, proceeds expressly governed by the Horse Racing Act, Camarero is operating simulcast wagering outside the parameters of Puerto Rico's statutory framework. This unlawful deviation not only violates the Horse Racing Act but also places Camarero in direct breach of the IHA, which prohibits any person or entity from conducting or benefiting from interstate wagering except in accordance with state law.

85.    Because simulcast wagering necessarily involves interstate transmissions of betting data and funds, Camarero's refusal to distribute those proceeds lawfully constitutes a distortion of interstate commerce and an unlawful interference with federally regulated economic activity. By withholding or redirecting funds that originate from interstate simulcast wagers, Camarero has effectively disrupted the statutory balance the IHA was designed to protect, the balance between state regulatory authority and the federal government's interest in ensuring fair and uniform interstate wagering practices.

86.    Accordingly, Camarero's ongoing conduct amounts to an unauthorized and unlawful exercise of inters state wagering activity in violation of 15 U.S.C. §§ 3001–3007 and Article I, Section 8 of the U.S. Constitution (the Commerce Clause), warranting both declaratory and injunctive relief from this Court.

### *COUNT IX – Civil Conspiracy to Deprive Civil Rights (42 U.S.C. §1985(3))*

87.     The Civil Rights Act allows for remedies when there is a conspiracy to interfere with civil rights, as coded in 42 U.S.C. §1985(3):

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

88.     Defendants have conspired to deprive PRHOA and its members of equal protection and due process of law by jointly agreeing to exclude PRHOA from statutory proceeds and coerce membership into CHPR, a competing organization of horse owners.

### *COUNT X – Reserved: Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1961–1968)*

89.     PRHOA alleges on information and belief that Defendants have used interstate communications, mail, and financial transfers to implement and conceal their scheme. PRHOA reserves the right to amend this complaint after discovery to assert a civil RICO claim once the specific predicate acts are identified.

### *COUNT XI – Violation of Puerto Rico Constitution (Art. II, §§7, 8 & 19)*

90.     Defendants' actions have violated PRHOA members' rights to due process, equal protection, and freedom of association, as guaranteed by the Constitution of the Commonwealth of Puerto Rico.

### COUNT XIII – Declaratory and Injunctive Relief

91.     PRHOA seeks declaratory and injunctive relief under 28 U.S.C. §§2201–2202, declaring Defendants' conduct unlawful and enjoining them from excluding PRHOA and its members from simulcast-in proceeds.

## VI.    PRELIMINARY INJUNCTION REQUEST

92.     Pursuant to Fed. R. Civ. P. 65 and the equitable principles in *Winter v. NRDC*, 555 U.S. 7 (2008), PRHOA seeks an immediate preliminary injunction ordering Camarero to:

i.   Resume the distribution of simulcast-in proceeds to PRHOA and its members pending adjudication of this action;

ii.  Cease enforcing any agreements or directives that exclude PRHOA and its members from simulcast-in proceeds; and

iii. Maintain the status quo to prevent irreparable harm and preserve PRHOA and its members due process rights.

PRHOA and its members face irreparable harm through the ongoing deprivation of statutory funds and loss of association rights that cannot be adequately compensated by monetary damages.

## VII.   JURY DEMAND

93.     PRHOA demands a trial by jury on all issues so triable

## VIII.  PRAYER FOR RELIEF

WHEREFORE, PRHOA respectfully requests that this Court:

1.  Enter judgment for PRHOA and against all Defendants;

2. Declare that Defendants' actions violate the U.S. Constitution, 42 U.S.C. §§1983 and 1985, the Sherman Act, and the IHA;

3. Issue preliminary and permanent injunctions ordering Defendants to immediately resume and maintain equitable distribution of simulcast-in proceeds to PRHOA and its members;

4. Award compensatory and treble damages to PRHOA and against Defendants pursuant to 15 U.S.C. §15, in an amount no less than $500,000.00;

5. Award attorneys' fees and costs under 42 U.S.C. §1988 and 15 U.S.C. §15; and

6. Grant such further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED**

San Juan, Puerto Rico this 31st day of October, 2025.

**García & Rivera LLC**
P.O. Box 9022074
San Juan, P.R. 00902-2074
Tel. 787-425-5424

**s/ CARLOS G. GARCÍA MIRANDA**
**USDC-PR 302101**
**E-mail: cgarcia@garciariveralaw.com**