## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **PUERTO RICO HORSE OWNERS ASSOCIATION (PRHOA),** On behalf of its members<br><br>**Plaintiff,**<br><br>v.<br><br>**CAMARERO RACE TRACK CORPORATION; ERVIN RODRÍGUEZ,** its President; **CONFEDERACIÓN HÍPICA DE PUERTO RICO; RAFAEL MATOS,** its President, **NILDA FUENTES, ESQ.**, and the Conjugal Partnership between them; **FERNANDO BONNET**, its Agent; and **JOHN DOES 1–10,**<br><br>**Defendants.** | **CIVIL ACTION NO.**<br><br>PROCEDURAL DUE PROCESS (42 U.S.C. §1983); EQUAL PROTECTION (42 U.S.C. §1983); TAKING WITHOUT JUST COMPENSATION (FIFTH & FOURTEENTH AMENDMENTS); FREEDOM OF SPEECH AND ASSOCIATION (FIRST AMENDMENT); SHERMAN ACT (15 U.S.C. §1, ET SEQ.); INTERSTATE HORSERACING ACT (15 U.S.C. §3001–3007); DECLARATORY AND INJUNCTIVE RELIEF (28 U.S.C. §§2201–2202); TRIAL BY JURY DEMANDED |

### MEMORANDUM OF LAW IN SUPPORT TO MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION

**TO THE HONORABLE COURT:**

Plaintiff, Puerto Rico Horse Owners Association ("PRHOA"), by and through undersigned counsel, respectfully moves this Honorable Court, pursuant to Fed. R. Civ. P. 65(b), for the entry of a Temporary Restraining Order ("TRO") and an Order to Show Cause why a preliminary injunction should not issue against defendant Camarero Race Track Corporation ("Camarero") to prevent imminent and irreparable harm to PRHOA and its members.

### I.      FACTUAL BACKGROUND

#### A.   In General

1.      The horse racing industry and sport in Puerto Rico is highly regulated by the Commonwealth of Puerto Rico. Under the "Government of Puerto Rico Gaming Commission Act," 15 L.P.R.A. § 981 *et seq*. (the "Gaming Commission Act"), horse racing activities are

regulated by the Puerto Rico Gaming Commission (the "Commission"), a governmental agency vested with statutory authority to oversee the racing industry and sport, and enforce compliance with the "Puerto Rico Horse Racing Industry and Sport Act" (the "Horse Racing Act") and applicable regulations.

2.      The Commission has ample powers to regulate horse racing activities in Puerto Rico. Section 4 of the Horse Racing Act, 15 L.P.R.A. § 198e, titled "Powers of the Government of Puerto Rico Gaming Commission", which states:

> (b) The Commission is hereby empowered to regulate all matters concerning the Horse Racing Industry and Sport. The Commission, after holding a public hearing, shall adopt such Horse Racing Sport regulations it deems necessary, which, once approved by the Commission and filed with the Department of State pursuant to the provisions of Act No. 38-2017, the 'Government of Puerto Rico Uniform Administrative Procedure Act,' shall have force of law and the violation thereof shall constitute an offense as provided in this Act.

> (c) Among other things, the Commission shall have the authority to:

> 1. **Establish by regulations the necessary and essential requirements which, in its judgment, every racetrack should meet to operate as such; establish the terms and conditions to meet said requirements; issue temporary licenses for the period granted to racetrack owners to meet the Board's requirements; cancel any licenses issued temporarily to their holders or their representatives if they fail to comply with the terms thereof; ensure public safety as well as the reliability, honesty, and integrity of the horse racing sport**. Provided, that when financial information is required to grant permits or licenses to operate a racetrack, the financial information received by the Board shall be deemed to be confidential and may not be disclosed, except as provided by the Board and the applicable laws.

> a. When considering an application for operating a new racetrack, the Board shall require the applicant to demonstrate that the approval of the racetrack operations application shall be in the best interest and benefit of the horse racing industry, that it shall not affect the stability thereof, and that there shall be sufficient inventory of racehorses to sustain the independent operation of said racetrack

(Emphasis added).

3.      "Operator", as defined in the Horse Racing Act, "[m]eans a natural or juridical person authorized by means of a license to operate a racetrack in Puerto Rico" (15 L.P.R.A. § 198b (27)).

4.      "Racetrack", as defined in the Horse Racing Act, "[m]eans the place authorized through a license issued by the Government of Puerto Rico Gaming Commission for holding horse races in the jurisdiction of Puerto Rico and placing bets".

5.      Camarero is the only operator of the only licensed racetrack in Puerto Rico, with a racetrack license issued by the Commission, a government agency of the Commonwealth of Puerto Rico (see, Declaration of Charles A. Cuprill ("Declaration"), **Exhibit 1**, ¶ 2). According to Section 12 of the Horse Racing Act, Camarero pays annual fees, which are collected by the Executive Director of the Commission (see, 15 L.P.R.A. § 198r).

6.      Camarero, as the operator of Camarero Racetrack, has its own on-track betting tellers and designates off-track betting tellers and off-track betting locations (see, 15 L.P.R.A. § 198b (1) and (2)); is the owner of the "barns, stalls, or boxes" the Racetrack, also known as the "stables" (see, 15 L.P.R.A. § 198b (15)); and collects and distributes the wagering proceeds according to the Horse Racing Act, in particularly as established in its Section 13 and Section 29 (for electronic video games system) (see, 15 L.P.R.A. § 198s and y).

7.      The Horse Racing Act allows for simulcasting in Puerto Rico, defined as the "[s]imultaneous live and direct broadcasting of racing events held in foreign racetracks for taking bets on these. This term also refers to racing events held in Puerto Rico to be broadcast overseas for taking bets in another country on those races held in Puerto Rico" (15 L.P.R.A. § 198s).

8.      Pursuant to Section 9 (d) of the Horse Racing Act, 15 L.P.R.A. § 198o, the process of authorizing simulcasting is the following:

The racetrack or racetracks may request the Commission's authorization for simulcasting and/or electronically reproducing in Puerto Rico races held in other racetracks in order to broaden their local race program, accept wagers on, and obtain receipts from imported races. **The deductions provided in Section 20 of this Act shall apply to wagers placed in Puerto Rico on simulcast and/or otherwise electronically reproduced races**. Likewise, racetracks may request the Commission's authorization to simulcast and/or electronically reproduce live races held therein in order to allow other racetracks or authorized interstate offtrack betting locations to place wagers on such races. Racetrack operators are hereby authorized to enter into agreements with other racetracks and/or authorized interstate or international off-track betting locations, and to enter into agreements for simulcasting and/or electronically reproducing races. Any request for exporting the signal of live races held for placing interstate or international wagers shall be submitted to, and approved by the Commission and have the consent of the group representing a majority of horse owners participating in the applicant racetrack or the direct consent of the owners absent an owners' association representing a majority of owners. The Commission shall prescribe by regulations reasonable requirements for approving the simulcasting on a case by case basis, which shall operate independently from the local races.

(Emphasis added).

9.      Section 13 of the Horse Racing Act,[1] 15 L.P.R.A. § 198s, specifically states the deductions that can be made by Camarero as the operator of the Camarero Racetrack, stating:

Natural or juridical persons **operating racetracks** or firms authorized to calculate official payoffs, **shall only make the following deductions on the bets placed in their racetracks and in offtrack betting locations**. If there is a conflict with any law in effect, said law shall be rendered ineffective, and the deductions provided herein shall apply. If the gross amount wagered in any fiscal year does not exceed $165,000,000, the following deductions shall apply:

[…]

(4) Other authorized bets on the total gross amounts wagered:

(a) Eleven percent (11%) for off-track betting tellers' commissions.

(b) **32.30% to be divided according to the agreement between the racetrack operator and the horse owners**.

---

[1] When the Gaming Commission Act became effective on July 29, 2019, several articles of the Horse Racing Act were amended or renumbered. To that effect, Article 6.13 of the Gaming Commission Act amended and renumbered Article 20 of the Horse Racing Act, which thereby became Article 13 of the Horse Racing Act, 15 L.P.R.A. §198s (see also the full title of the Gaming Commission Act).

(c) **4.40% for the State Treasury's General Fund**.

(d) 1% for the Breeders' Fund.

(Emphasis added).

10.     Bets placed under the simulcasting system are other authorized bets on the total gross amounts wagered, regulated by Section 13(4) of the Horse Racing Act.

11.     Therefore, Camarero, operating under an exclusive license or franchise from the Commonwealth, administers all wagering proceeds under governmental regulation, including simulcasting, making it an instrumentality of the state.

12.     Horse owners under the Horse Racing Act need to have a valid license issued by the Commission (15 L.P.R.A. § 198b (24)). As discussed below, all licensed thoroughbred horse owners are legally entitled to share in the proceeds from simulcast-in wagering (see 15 L.P.R.A. § 198s).

13.     For many years, prior to PRHOA's creation, CHPR was the only association of horse owners operating at the Camarero Racetrack consisting of the majority of the horse owners in Puerto Rico.

14.     On January 23, 2007, Camarero and CHPR entered into a written agreement (the "Contract"), with an expiration date of December 31, 2010 (**Exhibit 2**), since then Purposedly renewed on a month-to-month basis by Camarero and CHPR excluding PRHOA as part thereof in clear violation of federal and state laws (see, **Exhibit 2**, ¶¶ FIVE and FORTY).

15.     On January 29, 2013, several licensed horse owners decided to form PRHOA, a lawful association whose founding and continuing purpose is to protect and promote the interests of its members and all participating racehorse owners in Puerto Rico (**Exhibit 3**), as well as the welfare of the horses racing at the Camarero Racetrack. PRHOA is composed of a substantial number of licensed thoroughbred horses, many of whom own a significant number of

thoroughbreds participating at the Camarero Racetrack (see, Declaration, **Exhibit 1**, ¶ 1). As mandated by state law, since PRHOA's creation, Camarero has uninterruptedly distributed simulcast-in proceeds to PRHOA's members and nonaffiliated horse owners to either PRHOA or CHPR (see, Declaration, **Exhibit 1**, ¶ 3).

16.    Currently, PRHOA represents over a hundred licensed horse owners by the Commission (see, Declaration, **Exhibit 1**, ¶ 1).

17.    PRHOA is not a contracting party to the Contract, and the Supreme Court of Puerto Rico expressly so held in *Puerto Rico Horse Owners Association v. Confederación Hípica de Puerto Rico*, 202 D.P.R. 509 (2019) ("*PRHOA v. CHPR*"), a final and unappealable decision. PRHOA respectfully requests that this Honorable Court take judicial notice of that judgment.

18.    However, since PRHOA's organization, Camarero and CHPR unlawfully applied the Contract to PRHOA and its members, deducting sums from the purse earnings of their horses not authorized by the Horse Racing Act, but stemming from the Contract to which PRHOA has never been a party.

19.    The Contract violates the Horse Racing Act, the Interstate Horseracing Act of 1978 (15 U.S.C. §§3001–3007) (the "IHA") and it is unconstitutional since it requires racehorse owners to be affiliated to the CHPR to receive simulcast-in proceeds.

20.    On November 26, 2021, PRHOA filed a suit against Camarero and CHPR in the Puerto Rico Court of First Instance (see, Puerto Rico's Court of First Instance Case No. CN2021CV00388) (the "State Case"), seeking the return of the illegally deducted funds and an injunction to permanently halt the unlawful practice.

21.    The State Case remains pending and unresolved as of this filing.

22.     Suddenly, via a letter sent on October 17, 2025, following private meetings between Camarero and CHPR, PRHOA received notice that beginning on **November 1, 2025**, Camarero would cease distributing proceeds from simulcast in wagering to PRHOA and its members (see, Declaration, **Exhibit 1**, ¶¶ 4 and 7; Camarero's October 17, 2025 letter (the "Notice"), **Exhibit 4**).

23.     PRHOA has made multiple efforts to persuade Camarero not to do so, but all such efforts have failed (see, **Exhibits 5** and **6**). As a result, PRHOA and its members now face imminent and irreparable harm (see, Declaration, **Exhibit 1**, ¶¶ 6 and 9).

24.     PRHOA's members hold a property right in the simulcast in revenues allocated to all licensed racehorse owners participating at the Camarero Racetrack. This right is established by Puerto Rico statutory law and protected by the Constitution of the United States and applicable federal law (see, cited laws below and bow; see also, Declaration, **Exhibit 1**, ¶¶ 5 and 6).

25.     In *PRHOA v. CHPR*, supra, the Puerto Rico Supreme Court further recognized that horse owners have a constitutional right to affiliate—or to decline to affiliate—with any association of their choosing, rights grounded in the freedom of expression and association guaranteed by the Constitutions of Puerto Rico and the United States.

26.     Currently, Camarero and CHPR are conditioning the payment of monies— belonging by law to all licensed racehorse owners—on those their mandatory membership in CHPR, in direct violation of constitutional protections (see, Declaration, **Exhibit 1**, ¶¶ 4, 5 and 8).

27.     Camarero's decision to halt payments of proceeds from simulcast into PRHOA's members is arbitrary, lacks any statutory or regulatory basis, was made without notice or hearing, and directly violates Puerto Rico law (see, Declaration, **Exhibit 1**, ¶ 7).

28.     The exclusion seeks to coerce PRHOA's members into joining CHPR, thereby consolidating political and financial control over the racing industry. If this were to happen, only

one racehorse owners' association would forcibly exist (see, Declaration, **Exhibit 1**, ¶¶ 3, 5, 6 and 8).

29.     The Commonwealth receives a percentage of all wagers at Camarero Racetrack, confirming the symbiotic relationship between Camarero and the state (see, 15 L.P.R.A. § 198s), not only resulting from the exclusive license granted by the state to Camarero to operate the Racetrack but in the monetary participation of the state in Camarero's operation of the Racetrack.

30.     Defendants' conduct will deprive PRHOA and its members of their property rights without due process, the equal protection of the Racing Act, and will restrain trade in violation of federal law (see, Declaration, **Exhibit 1**, ¶ 7).

A.     <u>Camarero Acting under Color of State Law</u>

31.     Camarero operates under an exclusive franchise and license granted by the Government of Puerto Rico pursuant to the Horse Racing Act and related regulations. Through this statutory framework, the Commonwealth has delegated to Camarero the authority to organize, manage, and regulate certain areas of the horse racing industry, including the operation of Camarero Racetrack and related activities, as well as the collection and distribution of pari-mutuel wagering, and simulcast activities on the island, with the corresponding deductions. No other private entity is permitted to perform these functions.

32.     As a result, Camarero's actions are "fairly attributable to the state" and constitute state action for purposes of the Fourteenth Amendment and 42 U.S.C. §1983. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). When a private entity exercises powers that are traditionally the exclusive prerogative of the state, it is bound by constitutional limitations. See *West v. Atkins*, 487 U.S. 42, 49–50 (1988); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974).

33.     Specifically, Camarero qualifies as a state actor under multiple recognized legal doctrines:

a.     *Public Function Doctrine* – The management of the Camarero Racetrack and its grounds; the receipt and allocation of purse proceeds; the designation of off-track betting tellers and locations; and the enforcement of racing rules are traditionally governmental functions. By statute, Camarero performs these duties on behalf of the Commonwealth and under the direct supervision of the Commission. This agency oversees Camarero's compliance with the Racing Act and approves operational rules, while the Government of Puerto Rico receives a percentage of all wagers as public revenue. See *Evans v. Newton*, 382 U.S. 296 (1966) (private entity performing public function deemed state actor).

b.     *Close Nexus / Joint Action Doctrine* – There exists a symbiotic and interdependent relationship between Camarero and the Government of Puerto Rico. The Commonwealth shares Camarero's revenues through mandatory distributions of wagering proceeds and directly benefits from its operations. The State, in turn, has granted Camarero monopoly control, supervises its activities, and enforces its decisions as part of the official regulatory structure. This entanglement renders Camarero's actions "jointly engaged" with the state. See *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961).

c.     *State Compulsion Doctrine* – Puerto Rico law requires Camarero to act pursuant to state law and regulations, and its decisions on purse distributions and simulcast proceeds are governed by the statutory framework. The Commonwealth compels and enforces these actions through its licensing authority and coercive power. When

a private entity's conduct is compelled or significantly encouraged by the state, it constitutes state action. See *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

d. *Delegation of Sovereign Power* – Camarero's authority to distribute simulcast proceeds, designate off-track betting tellers and locations, and impose or withhold payments is an exercise of delegated sovereign power. The Commonwealth has entrusted Camarero with quasi-public duties that directly affect property rights and the livelihood of licensed horse owners, and thoroughbred horses breeders. When the state delegates such authority, constitutional accountability follows. See *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).

34.     Moreover, Camarero's revenues and operational decisions are statutorily intertwined with the Commonwealth's public funds and regulatory oversight. The Government of Puerto Rico collects a statutory share of wagering proceeds and maintains supervisory jurisdiction over all racing and betting operations, confirming that Camarero functions as an instrumentality of the state and not as a purely private enterprise.

35.     Accordingly, **Camarero's conduct in suspending the simulcast-in proceeds to PHROA and its members constitutes state action taken under color of law**, directly subject to the restrictions of the **First, Fifth, and Fourteenth Amendments** and actionable under **42 U.S.C. §1983**. Camarero's decision to favor one association of horse owners (CHPR) over another (PRHOA), and preclude PRHOA's exercise of constitutional rights, and deprive its members of protected property interests, therefore, amounts to **unconstitutional government conduct**, even if implemented through a nominally private entity.

## II.     LEGAL STANDARD

36.     Under Fed. R. Civ. P. 65(b), a TRO may issue to preserve the status quo and prevent irreparable harm before a full hearing. Specifically, Fed. R. Civ. P. 65(b) states that "[t]he court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."

37.     Furthermore, the Supreme Court of the United States, has developed additional requirements to evaluate whether or not to issue a TRO, demanding that the movant demonstrates:

a.  A likelihood of success on the merits,

b.  Irreparable harm in the absence of relief,

c.  That the balance of equities favors the movant, and

d.  That the injunction serves the public interest.

> (See, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Amoco Production Co.* v. *Gambell*, 480 U. S. 531, 542 (1987); *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 311–312 (1982); *Munaf* v. *Geren*, 553 U. S. 674 (2008)).

## IV. ARGUMENT

### A.  <u>Likelihood of Success on the Merits</u>

38.     PRHOA easily satisfies this first and most important element of the injunction test. The facts and law establish that PRHOA is likely to succeed on multiple independent federal causes of action.

39.     <u>*Section 1983 – Due Process Violations*</u>: The Civil Rights Act of 1871 (the "Civil Rights Act") allows for a civil action for deprivation of rights under 42 U.S.C. § 1983, which mandates that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia

40.     The Fourteenth Amendment of the U.S. Constitution, in its relevant part to this matter, states that: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws" (U.S. Const. amend. XIV, § 1).

41.     "Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, *Id.* at 333. Se also, *Wolff v. McDonnell,* 418 U. S. 539 (1974); *Phillips v. Commissioner,* 283 U. S. 589 (1931).

42.     The simulcast-in proceeds constitute a vested property right under Puerto Rico law for all racehorse owners duly licensed by the Commission. Section 9 (d) of the Horse Racing Act allows for simulcasting wagering and specifically states that the deductions provided in Section 13, previously Section 20, of the Horse Racing Act apply to simulcasting. Section 13 of the Horse Racing Act, 15 L.P.R.A. § 198s, regulates the deductions that can be made to bets to calculate the official payoffs, stating that operating racetracks (Camarero) "**shall only make the following deductions on the bets placed in their racetracks and in offtrack betting locations**." Simulcast-

in wagering falls within Section 13's subsection (4), titled "Other authorized bets on the total gross amounts wagered", which **only** allows the following deductions:

a) Eleven percent (11%) for off-track betting tellers' commissions.

(b) **32.30% to be divided according to the agreement between the racetrack operator and the horse owners**.

(c) 4.40% for the State Treasury's General Fund.

(d) 1% for the Breeders' Fund.

(Emphasis added).

43.     Regarding the simulcast-in wagering, Camarero has no legal authority to make further deductions or to make payoffs in contravention of subsection (4) of Section 13 of the Horse Racing Act.

44.     The racetrack operator (Camarero) and the horse owners (including PRHOA's members) had agreed to distribute 32.30% of the deductions allowed under paragraph (b) of subsection (4) of Section 13 of the Horse Racing Act equally among them, according to the customs of the horse racing industry and sport. Therefore, according to state law, all horse owners with a valid license issued by the Commission, regardless of their association to PRHOA and CHPR, have a vested interest in receiving simulcast-in proceeds. Camarero had been complying with the state-mandated distribution of simulcast-in proceeds for at least the last twelve (12) years, basically since the foundation of PRHOA (see, Declaration, **Exhibit 1**, ¶ 3). With the Notice, Camarero unilaterally halts the payments mandated by the Horse Racing Act and retains the proceeds related to simulcast-in that correspond to PRHOA's members.

45.     Camarero, acting under color of state law as the exclusive government-licensed racetrack, has deprived PRHOA members of this property interest without notice or opportunity

to be heard, in violation of procedural due process. Its unilateral and arbitrary action directly contravenes established constitutional standards under *Mathews v. Eldridge*, supra.

46.    *Equal Protection and Arbitrary Discrimination*: Camarero has intentionally treated PRHOA and its members differently from similarly situated horse owners affiliated with CHPR, without any rational basis. The Supreme Court of the United States has held that:

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. [...]. In so doing, we have explained that" '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" (Internal citations omitted).

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)

47.    The disparate treatment of PRHOA's members by Camarero constitutes a violation of the Equal Protection Clause under the "class-of-one" doctrine. See *Vill. of Willowbrook v. Olech*, Id.

48.    *First Amendment – Freedom of Association*: The First Amendment to the U.S. Constitution asserts that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances" (U.S. Const. amend. I).

49.    In *PRHOA v. CHPR,* supra, the Supreme Court of Puerto Rico resolved that the "Horse owners are free to organize—or not to organize—for the purpose of negotiating the terms that best suit their interests in their relationship with the operating company. The law does not require an intermediary" (our translation), protecting PRHOA's members freedom of association.

50.     Camarero's conditioning of statutory benefits on forced membership in CHPR amounts to compelled association, in violation of the First Amendment. Government actors may not condition public or financial benefits on membership in or support for a particular organization. See *Janus v. AFSCME*, 585 U.S. 878 (2018) (compelling public employees to financially support a union they do not wish to join violates the First Amendment right to free association); *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990) (government actors cannot use employment or economic benefits to penalize or coerce political association, establishing that conditioning public benefits).

51.     <u>*Takings Clause – Fifth and Fourteenth Amendments*</u>: The Fifth Amendment to the U.S. Constitution states that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation" (U.S. Const. amend. V).

52.     The Supreme Court of the United States "has been permissive in upholding governmental action that may deny the property owner of some beneficial use of his property or that may restrict the owner's full exploitation of the property, if such public action is justified as promoting the general welfare". *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 163 (1980). However, "a State, by *ipse dixit,* may not transform private property into public property without compensation, even for the limited duration of the deposit in court. This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent. That Clause stands

as a shield against the arbitrary use of governmental power." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, Id. at 164.

53.    Therefore, Camarero, as a state actor, by withholding the simulcast-in proceeds belonging to PRHOA's members, an action that is not rooted in the promotion of public welfare, has effected a taking of private property without just compensation.

54.    *Interstate Horseracing Act (15 U.S.C. §§3001–3007)*: The IHA provides that states shall have the primary responsibility to determine what wagering on horse races may lawfully take place within their borders. 15 U.S.C. § 3001(a)(1). Nevertheless, it allows a state to authorize the acceptance of wagers on horse races conducted in another state, provided that such wagering is legal both in the state where the races are held and, in the state, where the bettor is located. The statute expressly stipulates that "no person may accept an interstate off-track wager except in accordance with the provisions of this chapter." 15 U.S.C. § 3003.

55.    The IHA further recognizes that states, including the Commonwealth of Puerto Rico, have the primary responsibility to determine the forms of wagering that may lawfully occur within their jurisdiction, and that the Federal Government must prevent interference by one state with the wagering policies of another. 15 U.S.C. § 3001(a)(1)–(2).

56.    The conduct of Camarero constitutes a direct violation of the IHA and the Commerce Clause of the United States Constitution. Under the IHA, interstate simulcast wagering may only occur when conducted and distributed in full compliance with applicable state laws. See 15 U.S.C. §§ 3001(a)(1) and 3003.

57.    By unilaterally suspending the payment and distribution of simulcast-in proceeds owed to PRHOA and its members—proceeds expressly governed by the Horse Racing Act—Camarero is operating simulcast-in wagering outside the parameters of Puerto Rico's statutory

framework. This unlawful deviation not only violates Puerto Rico's horse racing statutes but also places Camarero in direct breach of the IHA, which prohibits any person or entity from conducting or benefiting from interstate wagering except in accordance with state law.

58.     Because simulcast-in wagering necessarily involves interstate transmissions of betting data and funds, Camarero's refusal to distribute those proceeds lawfully constitutes a distortion of interstate commerce and an unlawful interference with federally regulated economic activity. By withholding or redirecting funds that originate from interstate simulcast-in wagers, Camarero has effectively disrupted the statutory balance the IHA was designed to protect—the balance between state regulatory authority and the federal government's interest in ensuring fair and uniform interstate wagering practices.

59.     Accordingly, Camarero's ongoing conduct amounts to an unauthorized and unlawful exercise of interstate wagering activity in violation of 15 U.S.C. §§ 3001–3007 and Article I, Section 8 of the U.S. Constitution (Commerce Clause), warranting both declaratory and injunctive relief from this Honorable Court.

60.     _Antitrust Violations – Sherman Act §§1–2_: Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1, et seq. (the "Sherman Act"), states that: "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court".

61.    Section 2 of the Sherman Act, 15 U.S.C. § 2, asserts that: "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."

62.    Camarero and CHPR's agreement to exclude PRHOA constitutes an unlawful group boycott and monopolization of horsemen's representation in Puerto Rico, in violation of the Sherman Act. See *Fashion Originators' Guild v. FTC*, 312 U.S. 457 (1941) (private association of competitors violated the Sherman Act by collectively boycotting and coercing others to enforce its own rules outside the law).

63.    <u>*Substantive Due Process and Abuse of Power*</u>: In explaining the meaning and extent of the substantive due process, the Supreme Court of the United States has stated:

> Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be "arbitrary in the constitutional sense," […] thereby recognizing the point made in different circumstances by Chief Justice Marshall, "'that it is a constitution we are expounding,'" […]. Thus, in Collins v. Harker Heights, for example, we said that the Due Process Clause was intended to prevent government officials '" "from abusing [their] power, or employing it as an instrument of oppression.'" […].

> To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience. We first put the test this way in Rochin v. California, supra, at 172-173, where we found the forced pumping of a suspect's stomach enough to offend due process as conduct "that shocks the conscience" and violates the "decencies of civilized conduct". (Internal citations omitted).

> *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

64. Camarero's arbitrary and oppressive conduct—punishing PRHOA for exercising protected rights and favoring a politically aligned association—"shocks the conscience" under *County of Sacramento v. Lewis*, Id.

65. In sum, PRHOA's claims are firmly grounded in established constitutional and statutory protections, giving it a strong likelihood of success on the merits.

## B. Irreparable Harm

66. The harm to PRHOA and its members is immediate, ongoing, and irreparable for multiple independent reasons:

67. *Deprivation of Property Rights*: Camarero's actions constitute an ongoing and unlawful deprivation of property rights protected by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and the Puerto Rico Constitution (Art. II, §§ 7 and 9). Under the Horse Racing Act all duly licensed horse owners are statutorily entitled to receive a proportional share of the simulcast-in wagering proceeds derived from activities conducted under the supervision and control of the Commonwealth. These proceeds are not discretionary subsidies or private contracts—they are statutory entitlements created by law and administered by Camarero as the Commonwealth's exclusive franchisee and fiscal agent for the horse-racing industry.

68. By unilaterally deciding, through the Notice, to suspend the distribution of simulcast-in proceeds owed to PRHOA and its members, Camarero has deprived them of a vested property interest without due process of law. No statute, regulation, or administrative order authorizes Camarero to withhold or reallocate these funds, and no prior notice or opportunity to be heard was afforded to PRHOA or its members before the deprivation occurred. Such conduct squarely violates the procedural protections guaranteed by the Due Process Clause.

69.     The simulcast-in proceeds are statutory property rights protected under Puerto Rico law. Their suspension constitutes an ongoing violation of the Due Process Clause and causes irreparable injury. See, *Elrod v. Burns*, 427 U.S. 347 (1976).

70.     *Organizational Destabilization and Operational Disruption*: Camarero's actions have caused and continue to cause severe organizational destabilization to PRHOA, threatening its ability to function as an independent, self-governing association. PRHOA is not a casual grouping of individuals; it is a legally incorporated, licensed organization representing the collective interests of a significant segment of Puerto Rico's racehorse-owner community. Its existence depends on the confidence of its members, the regular inflow of statutory simulcast-in revenues, and the ability to advocate effectively before regulators and industry stakeholders.

71.     By suspending the simulcast-in distributions owed by statute to PRHOA and its members, Camarero has cut off one of PRHOA's primary financial lifelines. Without those funds, PRHOA cannot sustain its day-to-day administrative operations, maintain staff, cover licensing and compliance costs, or continue providing the representative services its members rely upon. This sudden deprivation has already forced PRHOA to reduce activities, defer obligations, and divert resources from advocacy to emergency survival. Once an organization's structural stability and membership confidence are undermined, its loss of cohesion and functionality cannot later be remedied by monetary compensation.

72.     In PRHOA's case, this destabilization threatens its very existence as an effective advocate for independent horse owners in Puerto Rico. Without immediate injunctive relief restoring the lawful flow of simulcast-in proceeds and prohibiting further coercive actions by Camarero, PRHOA faces imminent collapse: loss of staff, attrition of membership, forfeiture of regulatory credibility, and permanent impairment of its ability to represent its constituents. Such

institutional breakdown constitutes a classic form of irreparable harm warranting emergency judicial intervention.

73.    _Coerced Association_: Conditioning simulcast-in payments on membership in CHPR forces PRHOA's members to surrender their First Amendment right to freedom of association, an injury that cannot be undone once coerced. See, _Elrod v. Burns_, supra ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury", at p. 373); _Janus v. AFSCME_, supra. PRHOA is facing a mass exodus from its members to join CHPR just to have participation of the simulcast-in proceeds, an exodus that has already begun with the mere sending of the Notice.

74.    _Competitive Disadvantage_: The Notice—issued jointly or in consultation with CHPR—explicitly announced that the distribution of simulcast-in proceeds would cease for PRHOA members, while remaining available to others. This ultimatum forces horse owners to choose between (1) maintaining membership in PRHOA and forfeiting their statutory income, or (2) surrendering their associational rights and joining CHPR to secure access to those same funds. Such a forced choice between constitutional liberty and economic survival is precisely the kind of state-backed coercion the First Amendment forbids.

75.    The Supreme Court has repeatedly held that conditioning economic or professional benefits on compelled association violates the First Amendment. In _Janus v. AFSCME_, supra, the Court held that public employees cannot be forced to financially support a union against their will, emphasizing that "compelling individuals to subsidize the speech of private associations seriously impinges on First Amendment rights."

76.    Denying PRHOA's members their proceeds while CHPR's members continue to receive funds creates an unlawful economic imbalance in the horse racing market, distorting

competition and eroding the integrity of the industry. If this unlawful imbalance is allowed to continue, PRHOA's members would be obliged to join CHPR to receive the economic benefits of the simulcast-in proceeds.

77.    The resulting harm is immediate and irreparable. Once individuals are coerced into abandoning their chosen association under the threat of economic deprivation, the damage to their autonomy, expressive identity, and organizational integrity cannot be undone by later court order. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury).

78.    Moreover, this coerced association undermines PRHOA's collective expressive purpose. The Association was formed to provide an alternative voice within the horse racing industry and to advocate for fair and transparent management of racing revenues. Defendants' scheme seeks to extinguish that independence by compelling all horse owners to consolidate under CHPR's control. The destruction of organizational pluralism and elimination of dissenting representation constitute harms of a constitutional dimension that no monetary relief could redress.

79.    Absent immediate injunctive relief, the coercive conditions imposed by Camarero will continue to force PRHOA's members to relinquish their associational rights, dismantle the Association's independence, and permanently reshape the landscape of horse racing governance in Puerto Rico in violation of the First and Fourteenth Amendments. Such compelled conformity, imposed under the guise of regulatory or contractual authority, represents exactly the type of state-facilitated coercion the First Amendment was designed to prevent.

80.    *Reputational Harm*: Camarero's actions have inflicted and continue to inflict serious reputational harm upon the PRHOA. By falsely portraying PRHOA as illegitimate, unrecognized, or ineligible to receive simulcast-in proceeds, and by unlawfully suspending those

distributions, Camarero undermines PRHOA's credibility, legitimacy, and standing before its members, regulators, and the broader horse racing community. This reputational injury is unique and irreparable, as it directly undermines PRHOA's institutional mission—to advocate for and protect the interests of horse owners in Puerto Rico—and weakens its capacity to recruit and retain members.

81.    Once public trust and confidence in a professional association are damaged, they cannot be restored merely through monetary compensation. The reputational stigma generated by Camarero's actions has caused chilling effects among existing and prospective members, discouraging participation and eroding PRHOA's representational strength.

82.    Moreover, the reputational harm has cascading economic and regulatory consequences: PRHOA's diminished credibility before the Commission reduces its ability to engage in lawful advocacy, participate in consultations, and fulfill its statutory role as a voice for horse owners. This loss of institutional standing threatens PRHOA's continued existence as an effective association, a form of harm the courts recognize as inherently irreparable. *See Elrod v. Burns*, supra (loss of First Amendment freedoms constitutes irreparable injury).

83.    *Regulatory Destabilization*: Camarero's conduct undermines the statutory framework governing Puerto Rico's horse racing industry, threatening systemic harm to the public interest.

### C.  **Balance of Equities**

84.    The balance of equities overwhelmingly favors PRHOA. The relief requested merely preserves the status quo — the continuation of simulcast-in payments as required by law — and prevents Camarero from engaging in unlawful deprivation of rights. The harm to Camarero

from continuing their long-standing payment practice is negligible compared to the substantial, imminent, and irreparable harm PRHOA faces if the suspension proceeds.

85.     Camarero cannot claim hardship from being required to comply with existing statutory obligations or constitutional mandates. By contrast, denial of relief will cause PRHOA's organizational collapse, loss of member rights, and permanent destruction of goodwill. Courts routinely find that preserving the exercise of constitutional rights outweighs any administrative burden on government actors. See *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020). The equities thus tilt decisively in favor of injunctive relief.

### D.  **Public Interest**

86.     Granting the TRO serves the public interest by reinforcing both the rule of law and public confidence in Puerto Rico's regulated horse racing industry. The public has a strong interest in ensuring that state actors and their private partners comply with constitutional and statutory safeguards, particularly when handling public wagering funds.

87.     The injunction also promotes transparency, fairness, and stability within the horse racing market, preserving competition and preventing monopolistic control by a single private association. Moreover, protecting the constitutional rights of Puerto Rican citizens, including due process, equal protection, and freedom of association, is always in the public interest.

88.     An injunction will not only prevent unlawful deprivation of property but will safeguard the structural integrity of the Commonwealth's regulatory framework, ensuring that no private entity exerts unchecked power over a state-licensed monopoly. In this sense, maintaining fair access to statutory entitlements and protecting the livelihood of hundreds of horse owners and workers furthers the broader economic and social welfare of Puerto Rico.

**V. REQUEST FOR RELIEF**

Plaintiff respectfully requests that this Court:

1. Issue a Temporary Restraining Order immediately enjoining Camarero from discontinuing simulcast-in distributions to PRHOA and its members;

2. Order Camarero to maintain current distribution practices until the Court rules on a preliminary injunction;

3. Set a hearing within ten (10) days pursuant to Fed. R. Civ. P. 65(b)(3);

4. Require Camarero to show cause why a preliminary injunction should not issue; and

5. Grant such further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED**

San Juan, Puerto Rico this 31st day of October, 2025.

**García & Rivera LLC**
P.O. Box 9022074
San Juan, P.R. 00902-2074
Tel. 787-425-5424

**s/ CARLOS G. GARCÍA MIRANDA**
**USDC-PR 302101**
**E-mail: cgarcia@garciariveralaw.com**